# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| Secure Families Initiative; AND THEIR MEMBERS, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. _____ |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia; JON FERVIER, in his official capacity as Chairman of the STATE ELECTION BOARD; SARAH TINDALL GHAZAL, JANICE JOHNSTON, RICK JEFFARES, AND JANELLE KING, in their official capacities as members of the STATE ELECTION BOARD; Cobb County Board of Elections and Voter Registration on behalf of a class of all board of registrars in the State of Georgia | ) ) ) ) ) ) ) ) ) ) ) ) ) | Complaint – Class Action |
| *Defendants.* | | |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Secure Families Initiative and its members, bring this action against

Defendants Brad Raffensperger, in his official capacity as the Secretary of State of

Georgia; Jon Fervier, in his official capacity as Chairman of the State Election

Board; Sarah Tindall Ghazal, Janice Johnston, Rick Jeffares, and Janelle King, in

their official capacities as members of the State Election Board; and Cobb County

Board of Elections and Voter Registration representing the defendant class of boards of elections and registration, and allege the following:

## INTRODUCTION

1.      On May 6th, 2024, the Georgia Legislature enacted Senate Bill 189 ("S.B. 189")[1] which compels county administrators to sustain mass challenges and removes the ability for county administrators to dismiss challenges based on unreliable and questionable data. In recent elections, hundreds of thousands of eligible Georgia voters have been subject to erroneous voter challenges—some of whom do not know until Election Day that they must defend their right to vote. *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1288 (N.D. Ga. Jan. 2, 2024).

2.      Georgia law allows a Georgia voter to challenge another Georgia voter's right to vote in a particular election. O.C.G.A. §21-2-230. A sustained voter challenge under O.C.G.A. §21-2-230 can result in the removal of a voter from the voter rolls if the challenge is made on the grounds the voter is not a qualified elector. *See* O.C.G.A. §21-2-230; *see also Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021).

---

[1] A copy of S.B. 189 as passed by the Georgia General Assembly on March 29, 2024 ("S.B. 189/AP"), and enacted into law on May 6, 2024, is available on the Georgia's General Assembly website at: https://www.legis.ga.gov/legislation/64471.

3.     This lawsuit challenges certain provisions of Section 5 of S.B. 189, which modifies O.C.G.A. § 21-2-230, by mandating certain allegations be considered probable cause to sustain a voter challenge. S.B. 189 removes the discretion of county administrators to dismiss unfounded challenges by dictating that county boards of registrars shall find probable cause to sustain a voter challenge that a voter is not qualified to be an elector, and thus should be removed from the voter rolls, when the challenged voter has allegedly moved or is registered at a "nonresidential address."

4.     S.B. 189 does not define what evidence can be used to establish someone has moved or lives at a nonresidential address, and it also does not establish how a voter can prove they are in fact a qualified elector. Because there are no limitations or guidance on the type of evidence that can be used to either bring a challenge or rebut a challenge, counties have treated challenges to voters based on accusations of having moved or living at a nonresidential address differently.

5.     Together, these defects lead to a high risk of disenfranchisement of voters in violation of the First and Fourteenth Amendments. Many erroneously challenged and ultimately disenfranchised voters are military and overseas voters.

6.     Military and overseas voters already face disproportionate barriers in trying to cast their ballot. For example, these voters must update their registration or

request an absentee ballot each election cycle, print and scan back election forms, and deal with long and unreliable mail service or otherwise travel to their local embassy to submit their ballot.

7.    Military and overseas voters are also disproportionately affected by voter challenges because of the unique nature of establishing and maintaining their voting residence. Some of these voters, upon information and belief, are necessarily registered at P.O. boxes because they live on military bases that do not have "residential" addresses. Military and overseas voters also frequently move, which might lead to faulty evidence that they have changed their residence, and they are not able to adequately defend their right to vote if they are stationed or living outside of Georgia.

8.    Removal under S.B. 189 on the basis that someone has moved directly conflicts with Section 8(d) of the National Voter Registration Act (NVRA), which dictates the sole procedure for the lawful removal of registered voters from voter rolls based on a change in residence. Under Section 8(d) of the NVRA, a voter may only be removed from the voter rolls based on a change in residence if the voter requests or confirms his or her change of address in writing; or if after being sent a prepaid postage and pre-addressed mailing by their county election administrator,

the voter fails to respond to that mailing and then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d).

9.     By mandating that counties find probable cause to sustain a voter challenge on the grounds that someone is not a qualified elector because they are registered at a nonresidential address, S.B. 189 subjects some Georgia voters to unjustified burdens on their right to vote because residing at a "residential" address is not a qualification to vote under Georgia or federal law. This mandate discriminates against voters based on the classification of their address.

10.    Therefore, the challenged provision of S.B. 189 erects unreasonable and unjustified burdens on military and overseas voters by subjecting them to unsubstantiated challenges violating the First and Fourteenth Amendments of the United States Constitution, Section 8 of the NVRA, and Title I of the Civil Rights Act (CRA) of 1964 and thus must be permanently enjoined.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) and 52 U.S.C. § 10308(f) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Fourteenth Amendment to the United States Constitution, the National Voter Registration Act of 1993, and 42 U.S.C. § 1983. This Court likewise has jurisdiction pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

12.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and under Local Rule 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the legal and factual allegations giving rise to Plaintiff's claims occurred in this district and division.

## **PARTIES**

15.     Plaintiff **Secure Families Initiative ("SFI")** is a nonpartisan 501(c)(4) not-for-profit organization comprised of military spouses and family members. SFI is affiliated with the 501(c)(3) organization, Secure Families Foundation ("SFF").

16.     SFI began under an incubation program in January 2020 and then became a standalone nonprofit in January 2021. SFI is incorporated in Washington, D.C. and has four full-time staff members, four part-time staff members, and 44,403 members. SFI represents military members and their families serving abroad in at least eight different countries. Member families are also posted to military bases within the United States.

6

17.    SFI's mission is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities. Recognizing military members make enormous sacrifices to strengthen and defend our country, SFI seeks to influence issues of foreign policy and national security that especially impact SFI's members. SFI believes that mobilizing their community to vote and advocate is the most effective way to reshape the country's conversations around military intervention and ensure their members have a seat at the table over decisions that affect their own lives.

18.    Additionally, SFI advocates for federal and state policies that increase accessibility for absentee voters and registered military affiliated and disenfranchised voters. For example, SFI has endorsed pieces of federal legislation that would study the efficacy of the Department of Defense's (DOD) Voter Assistance Officer[2] program; standardize the ballot return deadline for UOCAVA ballots across the U.S.; and require all 50 states to provide UOCAVA voters with a ballot curing process. On the state level, SFI has consistently pushed for the expansion of electronic ballot return opportunities for UOCAVA voters.

---

[2] Voting Assistance Officers provide information and assistance to military and overseas voters regarding voter registration, absentee ballot procedures, and their voting rights under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). 10 U.S.C. § 1566a; *see also, Voting Assistance Officers*, Federal Voting Assistance Program, https://www.fvap.gov/vao.

19.    Because voting remains less accessible for its members and the broader military and overseas community, *see infra* Part I.A, SFI educates, registers, and engages in non-partisan "get-out-the-vote" efforts for military voters in all elections. SFI routinely publishes resources to assist its members and the broader military and overseas community. For example, SFI publishes material explaining to its voters how to vote by mail, how to find their voting assistance officer, and how to navigate state-specific election laws, including in Georgia.

20.    SFI has members registered in Georgia. SFI's members in Georgia include registered voters planning to vote absentee and in person. These members are registered to vote in different counties and face various barriers to access, such as frequent moves, overseas assignments, and confusion over where and how to register. It is unclear to these voters how each county will handle a potential challenge to their registration or eligibility, nor do they know how best to rebut a challenge made against them. SFI has worked to protect their members from voter eligibility challenges.

21.    As a result of S.B. 189, SFI will have to divert time and resources from their planned advocacy and educational efforts. Among other resource-intensive tasks, SFI will have to (1) determine whether their Georgia registered members will be susceptible to a sustained voter challenge because of the new probable cause

standard; (2) educate those members on the challenge process; and (3) attempt to advise these members regarding how to defend their right to vote and navigate the O.C.G.A. § 21-2-230 challenge process.

22.    SFI has already had to explain the impact of S.B. 189 to its members and prepared online materials to assist members in monitoring their registration/eligibility status. SFI has had multiple follow-up conversations with members who had questions about their voting status because of S.B. 189 and SFI continues to check-in with its Georgia-voting members regarding their challenge status.

23.    To date, SFI has spent thousands of dollars in paid staff time toward education and coaching to ensure its Georgia-voting members are aware of S.B. 189 and prepared to respond to any challenge against their registration or eligibility. That time and that money would otherwise have gone toward several projects that remain unfinished including working with members on utilization of voting assistance officers and membership recruitment.

24.    The interests SFI seeks to protect are germane to its organizational purpose; and neither the claims asserted, nor the relief requested requires the participation of individual members in the lawsuit.

25.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia, and as such, is the State's chief election officer and is responsible for administering and implementing Georgia's election laws and regulations and ensuring Georgia's compliance with the National Voter Registration Act. *See* O.C.G.A. §§ 21-2-210, 21-2-50, 45-13-20. Secretary Raffensperger is sued in his official capacity.

26.     Defendant JON FERVIER is Chairman of the State Election Board. Defendants SARAH TINDALL GHAZAL, JANICE JOHNSTON, RICK JEFFARES, AND JANELLE KING are members of the State Election Board. Together, the Defendants are responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of . . . registrars, deputy registrars . . . and other officials" and so as "to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote." O.C.G.A. § 21-2-31(1), (7).

**A. Class Action Allegations**

27.     The Defendant Class, represented by Cobb County Board of Elections and Voter Registration is defined as: all county board of registrars in the State of Georgia. Questions of law and fact are common among the county boards of registrars because they are responsible for adjudicating voter challenges under

10

O.C.G.A. § 21-2-230, as modified by S.B. 189, and O.C.G.A. § 21-2-229 based on the same standards. *See* F.R.C.P. 23(a)(2); *see also Whitaker v. Perdue*, No. 4:06-CV-0140-CC, 2006 WL 8553739, at *2 (N.D. Ga. Aug. 24, 2006) (government officials charged with enforcing an act satisfied the commonality requirement for F.R.C.P. 23 meriting class certification). The county boards of registrars, as a class, are sued in their official capacities.

28.    The Defendant Class, defined as all county board of registrars in the State of Georgia, totaling 159 county board of registrars, is so numerous as to make it impractical to join them all before this Court. Each county board of registrars has at least three registrars. *See* F.R.C.P. 23(a)(1).

29.    Defendant Cobb County Board of Elections and Voter Registration (the Board) can fairly and adequately represent the interests of the Defendant class because the Board's interests do not conflict with the interests of the Defendant Class members the Board would represent, and the Board is similarly situated to members of the Defendant Class. *See* F.R.C.P. 23(a)(4). A class representative "empowered with the same election law enforcement and oversight functions as every other county [board of registrars] . . . [with] the same duties and responsibilities as all other county [board of registrars] . . . can fairly and adequately protect the interests of the defendant class." *Nat'l Broad. Co. v. Cleland*, 697 F. Supp. 1204, 1217 (N.D. Ga.

1988). O.C.G.A §§ 21-2-230 and 21-2-229 direct each county board of registrar to adjudicate voter registration and voter eligibility challenges and Defendant Cobb County Board of Elections and Voter Registration has adjudicated O.C.G.A §§ 21-2-230 and 21-2-229 challenges including challenges to military and overseas voters for multiple election cycles based on residency data.

30.     The defenses of Defendant Cobb County Board of Elections and Voter Registration are typical of the Defendant Class as a whole. *See* F.R.C.P. 23(a)(3); *see also Whitaker*, 2006 WL 8553739, at *3 (the typicality requirement of F.R.C.P. 23 for class certification of defendants was met for government officials charged with enforcement of the same act and these officials had the same obligations under the act).

31.     Certification of a defendant class of all county board of registrars is appropriate under both F.R.C.P. 23(b)(1) and (2). Separate actions against individual class members would create the risk of inconsistent or varying adjudications resulting in incompatible standards of conduct by the counties if only some counties could adjudicate S.B. 189 voter challenges while others could not. *See* F.R.C.P. 23(b)(1)(A). All county board of registrars have an interest in "avoiding inconsistent results and obtaining guidance on the enforcement" of S.B. 189, meeting the requirements of F.R.C.P. 23(b)(1)(A). *Whitaker*, 2006 WL 8553739, at *4; *see also*

*Nat'l Broad. Co. v. Cleland*, 697 F. Supp. at 1217. Additionally, a final decision on the merits in an action against a single county board of registrars would have an impact upon or be dispositive of the interests of other Georgia county boards of registrars and "any declaratory or injunctive relief would necessarily affect the class as a whole," meeting the requirements of F.R.C.P. 23(b)(2). *Mauldin v. Wal-Mart Stores, Inc*., No. CIV.A.1:01-CV2755JEC, 2002 WL 2022334, at *16 (N.D. Ga. Aug. 23, 2002).

32.    A class action is therefore superior to other available means for the fair and efficient adjudication of the Defendant Class members' defenses.

## STATEMENT OF FACTS

### I.    General Background

#### A. Military and overseas voters face disproportionate barriers to casting their ballot

33.    Voting is more complicated for military and overseas voters, like SFI's members, because they move frequently, often must request an absentee ballot, and can face severe mail delays while living abroad impacting when they receive their absentee ballots and when their voted ballots are received by election officials.

34.    Such barriers facing military and overseas voters are nothing new and have sparked federal legislation meant to remedy these hurdles since at least 1955, with the Federal Voting Assistance Act. Nevertheless, confusing and restrictive state

13

laws have continued to necessitate additional legislation, such as Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), the Military and Overseas Voter Empowerment (MOVE) Act, and the National Voter Registration Act (NVRA). H.R. REP. NO. 99-765, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009, 2012.

35.    There are over 4 million U.S. citizens living overseas[3] and 7,494 Georgia registered electors entitled to vote under UOCAVA as of 2022. UOCAVA voters are U.S. citizens who are active members of the Uniformed Services, the Merchant Marines, the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, their eligible family members, and any other U.S. citizens residing outside the United States. When deliberating over the merits of enacting UOCAVA, Congress found that one reason why military and overseas citizens faced difficulties voting was because States had enacted legal

---

[3] The Federal Voter Assistance Program estimates there are 4.4 million U.S. citizens living overseas while the State Department estimates there are over 9 million U.S. citizens living overseas. *Compare* 2022 FEDERAL VOTING ASSISTANCE PROGRAM REPORT TO CONGRESS, FEDERAL VOTING ASSISTANCE PROGRAM (Aug. 3, 2023), https://www.fvap.gov/uploads/FVAP/Reports/rtc_20231113_V10_FINAL.pdf, *with*, CONSULAR AFFAIRS BY THE NUMBERS, U.S. DEPARTMENT OF STATE'S BUREAU OF          CONSULAR          AFFAIRS          (January          2020), https://travel.state.gov/content/dam/travel/CA-By-the-Number-2020.pdf.

and administrative obstacles that "discourage[d] or confuse[d] overseas citizens." *Id.* at 9.

36.    Georgia requires UOCAVA voters to request an absentee ballot every election cycle. O.C.G.A § 21-2-381(a)(1)(G). UOCAVA voters must submit an application for a Georgia absentee ballot, either via the Federal Post Card Application (FPCA) or via Georgia's absentee ballot application.

37.    While military and overseas voters are entitled to use the FPCA to request an absentee ballot, during the last three election cycles only 20-26% of all UOCAVA voters actually did so.[4] This suggests that many, if not most, of Georgia's military and overseas voters instead request their absentee ballot via the state's absentee ballot application form.

38.    Georgia requires a "wet signature" on absentee ballot applications, O.C.G.A § 21-2-381(a)(1)(C)(i), and there is no exception for UOCAVA voters. This means a voter stationed or living abroad, such as an active-duty military member stationed overseas, needs to find a printer to sign their application just to *request* their absentee ballot. Once requested, voters will then have to wait, enduring

---

[4]    *State of the Military Voter*, Federal Voting Assistance Program, https://www.fvap.gov/info/reports-surveys/StateoftheMilitaryVoter (last visited Oct. 11, 2024).

the inevitable delays of overseas mail, to finally receive their actual absentee ballot and return their voted absentee ballot.

### B. History of Voter Challenge Laws

39.     While voter challenge laws date back to the late 1800s and predate even basic election administration reforms such as the use of the secret ballot, these laws were originally enacted and historically used with the express intent to prevent newly enfranchised voters from accessing the ballot box, such as voters of color and minority voters. Contemporary federal civil rights laws recognized this history and outlawed voter challenges based on race or national origin. *See* 52 U.S.C. §§ 20507(b)(1), 10307(b); 42 U.S.C. § 1985.

40.     Despite federal protections, Black voters and other voters of color still face discriminatory use of challenge laws in Georgia. In 2004, after asking the Atkinson County Board of Registrars for a list of voters with Spanish surnames, three individuals filed challenges against 75% of the Latino voters in the county.[5] Later, in 2015, the Hancock County Board of Elections and Registration challenged

---

[5] Kate Uyeda, *Challenging the Challengers: How Partisan Citizen Observers Contribute to Disenfranchisement and Undermine Election Integrity*, 75 VAND. L. REV. 657, 679 (2022); Pam Fessler, *Hispanic Voter Registrations Challenged in Georgia*, NATIONAL PUBLIC RADIO (Oct. 27, 2004), https://www.npr.org/2004/10/27/4129390/hispanic-voter-registrations-challenged-in-georgia.

174 of its own voters, nearly all of whom were Black. After being sued for making racially biased improper challenges in violation of federal law, Hancock County entered into a settlement agreement agreeing not to engage in any discriminatory challenges to voters' eligibility. *Georgia State Conf. of NAACP v. Hancock Cnty. Bd. of Elections & Registration*, No. 5:15-CV-00414 (CAR), 2018 WL 1583160, at *2 (M.D. Ga. Mar. 30, 2018).

41.     That voter challenges have a history of being employed to discriminate against voters of color is relevant to SFI and its members. Nationwide, roughly 49 percent of new military recruits identify as Black, Indigenous, or a person of color and 22 percent of newly enlisted service members are Black. According to 2017 data, Georgia is overrepresented among the states providing military recruits, ranking third among southern states for providing the most military recruits. According to that same data, Georgia's share of military recruits exceeds the state's share of the U.S.'s young adult population (18-24 years old) by 30 percent.

## II.   Georgia Law Governing Voter Eligibility Challenges

### A. Establishing and Maintaining Georgia Residency for Military and Overseas Voters

42.     Georgia's constitution guarantees the right to vote to all United States citizens residing in Georgia who are at least 18 years old, and who have not been "convicted of a felony involving moral turpitude" without completing any related

sentence, or been "judicially determined to be mentally incompetent," without the disability having been removed. Ga. Const art. II, § I, ¶¶ II-III; *see also* O.C.G.A § 21-2-216(a)-(b).

43.    Georgia law defines a person's residence as "that place in which such person's habitation is fixed, without any present intention of removing therefrom[.]" O.C.G.A. § 21-2-217(a)(1). An individual does not lose their residence by leaving "for temporary purposes only, with the intention of returning, unless such person shall register to vote or perform other acts indicating a desire to change such person's citizenship and residence[.]" O.C.G.A. § 21-2-217(a)(2). Residing at a "residential" address is not a requirement to establish a residence for voting purposes. O.C.G.A. § 21-2-217.

44.    Federal law provides additional protections for those, like UOCAVA voters, who do not have a permanent residential address. For example, "[f]ederal law requires each State to provide absentee ballots to its former otherwise qualified residents who now reside outside of the United States." *Segovia v. United States*, 880 F.3d 384, 387 (7th Cir. 2018).

45.    Georgia law provides some similar protections, specifying that a person who moves to another state, federal territory, or foreign country "to engage in government service . . . shall not be considered to have lost [their] residence in

[Georgia] during the period of such service; and the place where the person resided at the time of [their] removal shall be considered and held to be such person's place of residence." O.C.G.A § 21-2-217(a)(11).

46.    Military members have both a voting residence and a home of record and these addresses are not necessarily the same. A voting residence is the address a military voter considers their permanent home – it is within the state of their legal residence or is their domicile. The state of legal residence does not automatically change when a military member is assigned to a new location for military duty. The home of record is the address a military voter lived at when they entered the military. This also does not change while a military voter is on active duty or when a military voter is assigned to a new duty location.

47.    For U.S. citizens residing outside the U.S., their voting residence is the last U.S. address at which they were domiciled. This address remains their voting residence even if they no longer own property, have other ties to the state, their intent to return to that state is uncertain, or whether their previous address is no longer a recognized residential address.

48.    Some military voters register to vote near their military base address, which can be a nonresidential address. For example, the Joint Forces Headquarters in Georgia is located at 1000 Halsey Ave, P.O. Box 1970, Marietta, GA 30061-0965.

19

P.O. boxes are considered nonresidential addresses. Upon information and belief, UCOVA voters stationed at Joint Forces Headquarters use a nearby P.O. box as their voter registration address.

49.    By necessity of their deployment or being overseas, military and overseas voters almost always have their absentee ballots sent to an address that differs from their address of voter registration. Most military and overseas voters use the address where they were last domiciled for voter registration purposes and have their absentee ballots sent to their mailing address rather than their voting residence or home of record address.

50.    For example, a military voter, registered in Georgia who may be registered at an address where other Georgia electors now reside, could be stationed out-of-state and own a house out-of-state because there is not enough on-base housing or they simply prefer to live off-base. This voter will request an absentee ballot to their out-of-state residential address and may even change their driver's license or vehicle registration to correspond with their out-of-state address. A search of this voter's information would falsely indicate that the voter has changed their residence even though they are in fact an eligible Georgia elector entitled to vote under UOCAVA.

51.     And because military and overseas voters are subject to frequent moves that require updates to their mailing address, these voters often appear in the National Change of Address (NCOA) Database. SFI has found that military voters are particularly vulnerable to challenges because a change of mailing address or registration at a nonresidential address can trigger a challenge.

## B. Voter Eligibility Challenge Process

52.      Georgia law allows a registered voter to challenge the eligibility of other registered voters in the same county to remain on the voter registration rolls, O.C.G.A. § 21-2-229, and to vote in a particular election, § 21-2-230. As of 2021, there is no limit on how many such challenges an individual can make.

53.     O.C.G.A. § 21-2-230(a) requires the registered voter making the challenge to make the challenge in writing and specify the grounds of the challenge. If the challenged elector is voting in-person, the challenge must be made prior to when the challenged elector votes. *Id*. If the challenged elector votes absentee, the challenge must be made before 5:00 PM on the day before the absentee ballots are scanned and tabulated. *Id*.

54.     The county then assesses whether there is probable cause to sustain the challenge. O.C.G.A. § 21-2-230(b). If the county board of registrars finds probable cause, the challenge is sustained. *Id*. If the county board of registrars do not find probable cause, the challenge is denied. *Id*.

21

55.     After sustaining a challenge, "if practical," the county board of registrars notifies the challenged elector of the challenge against them and provides the challenged elector an opportunity to answer the challenge. *Id*.

56.     If the county denies the challenge, the challenged elector is able to cast their ballot. *Id*.

57.     The challenge adjudication process varies depending on whether the challenge is made on the grounds that the voter is not qualified to remain on the list of electors or is made on other bases (like requesting an absentee ballot too early). *See* O.C.G.A. § 21-2-230.

58.     If the challenge is made on grounds that the voter is not qualified to remain on the list of electors, the county holds a hearing on the challenge that happens either before polls close or before certification of the returns. O.C.G.A. § 21-2-230(g)-(i). If the challenged elector votes in-person and the county upholds the challenge, the elector cannot vote and is removed from the voter rolls. O.C.G.A. § 21-2-230(h)-(i). If the challenged elector votes absentee and the county sustains the challenge, the challenged elector is removed from the voter rolls and their ballot is rejected and not counted. O.C.G.A. § 21-2-230(g).

## C. Voter Challenges Before SB 189

59.    Though Georgia's voter challenge statutes have been in effect since at least 1994, until 2020 they were employed only sparingly. More recently, mass challenges have been brought by those claiming that the 2020 election was stolen and seeking to sow distrust in elections and disenfranchise eligible citizens, including eligible military and overseas voters.

60.    In the wake of the 2020 Presidential Election, True the Vote (TTV), a Texas based organization, began a campaign to "Validate the Vote" and find the "illegal ballots…cast and counted in the 2020 general election." *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1250 (N.D. Ga. 2024). As part of this campaign, TTV facilitated mass challenges to voters under O.C.G.A. § 21-2-230 and planned to challenge over 350,000 voters right before Georgia's 2021 Senate runoff election. *Id*. at 1251. The list of challenged voters was generated from NCOA data, which often includes eligible military and overseas voters whose addresses appear to have changed but have not changed for the purposes of their voter registration. One of the individuals who brought such a mass challenge under TTV's direction later acknowledged that such data was likely to sweep in eligible military voters. *Id.* at 1251, 1258. A court found "TTV's list utterly lacked reliability. Indeed, it verge[d] on recklessness." *Id*. at 1274.

23

61.    Similar issues arose in Ben Hill and Muscogee Counties, which sustained mass challenges to thousands of voters under O.C.G.A. § 21-2-230, including challenges to military and overseas voters, brought by two individuals affiliated with TTV.[6] These sustained challenges were also based on NCOA data, despite a county board member understanding that NCOA data alone is insufficient to recommend a finding of probable cause. *Majority Forward v. Ben Hill County Board of Elections,* 512 F. Supp. 3d 1354 (M.D. GA 2021). A court found the sustained mass challenges likely violated federal law because the challenges were sustained without an individualized inquiry and many were erroneous. *Id.*

62.    Rather than try to curb these erroneous challenges, on July 1, 2021, Georgia enacted Senate Bill 202, which, among other things, amended Georgia's voter challenge laws to make clear challengers are allowed to bring an unlimited number of challenges under O.C.G.A. §§ 21-2-229 and 21-2-230.

63.    Without fear of penalties for bringing frivolous or meritless challenges, mass challenges have exponentially increased post-SB 202 and again, these challenges have included challenges against military and overseas voters.

---

[6] Associated Press, *Judge Blocks Residency Challenges to 4,000 Georgia Voters*, LAW.COM (Dec. 29, 2020), https://www.law.com/dailyreportonline/2020/12/29/judge-blocks-residency-challenges-to-4000-georgia-voters/?slreturn=20241003140639.

64.    In 2022 a single challenger submitted over 31,500 challenges in Forsyth County under O.C.G.A. §§ 21-2-229 and 21-2-230, only about 3 percent of which were sustained.[7] Another resident of Forsyth County challenged over 15,700 voters—6 percent of the county's voter rolls—based on NCOA data.[8] Because the challenger made no attempt to weed out military or student voters (eligible voters that have valid reasons for appearing in the NCOA database), Forsyth's Board of Elections dismissed the challenges wholesale.[9]

65.    In 2022 in Gwinnett County, a group called Voter GA, which is run by an individual named Garland Favorito and claims Georgia's election systems are fraudulent, made 37,500 voter eligibility challenges—about 6 percent of that county's voting population—and another 20,000 challenges to ballots cast in the

---

[7] Doug Bock Clark, *Close to 100,000 Voter Registrations Were Challenged in Georgia — Almost All by Just Six Right-Wing Activists*, PROPUBLICA (July 13, 2023), https://www.propublica.org/article/right-wing-activists-georgia-voter-challenges.

[8] Jane C. Timm, *Fraud hunters challenged 92,000 voter registrations in Georgia last year*, NBCNEWS (Feb. 27, 2023), https://www.nbcnews.com/politics/elections/fraud-hunters-challenged-92k-georgia-voter-registrations-2022-rcna71668.

[9] *Id.*

2020 election.[10] After spending around 250 hours to investigate the challenges, all were dismissed.[11]

66.     In August 2022, Marybelle Hodges, a participant in the organized voter challenge effort by VoterGA in Gwinnett County, lodged 269 challenges claiming the challenged voters requested absentee ballot applications too early and therefore should not be issued any absentee ballots. Some of these challenged applications may have been from UOCAVA voters from whom the state is required to accept an absentee ballot application even if the military or overseas voter has applied for an absentee ballot before the official request window opens. 52 U.S.C. § 20306.

67.     Challenges were also brought in 2022 claiming voters were ineligible electors because they were registered at nonresidential addresses, however some of the challenged voters were eligible to vote but just did not have a permanent address or were temporarily between residences.[12]

---

[10] *Affidavits to Challenge 37,500 Voter Roll Entries Including 20,000 Ballots Cast in the 2020 Election*, VOTERGA (Aug. 2022), https://voterga.org/wp-content/uploads/2022/08/Media-Advisory-Citizens-Challenge-37000-Voter-Roll-Entries.pdf.

[11] *Supra* note 6.

[12] Eli Saslow, *3 Georgia Women, Caught Up in a Flood of Suspicion about Voting*, N.Y.          TIMES          (Sept.          15,          2024) https://www.nytimes.com/2024/09/15/us/politics/georgia-voting-2024-election.html.

68.     These mass challenges generated needless and time-consuming administrative burdens for the election officials who had to review the challenges. For example, in voting to dismiss Hodges' challenge, a Gwinnett County board member found "that 98% of all challenges submitted thus far have proved to be unsubstantiated and without merit . . . [and] these challenges [did] not follow the protocol."[13]

69.     Overall, 95% of the challenges to voter registration brought in 2022 were erroneous in that the challenges did not identify voters that should be removed from the voter rolls.[14]

### D. Changes to the Voter Challenge Process under SB 189

70.     Relying on disinformation about the security of Georgia's elections, in 2024 the Georgia legislature passed S.B. 189. S.B. 189 removes counties' discretion to dismiss erroneous challenges and mandates that they find probable cause and sustain voter challenges based on certain types of allegations. The Georgia legislature did this despite overwhelming evidence that most voter challenges are

---

[13] Meeting Minutes, Gwinnett County Board of Voter Registrations and Elections Minutes,                     Oct.                     3,                     2022, https://www.gwinnettcounty.com/static/upload/bac/6/20221003/m_97074_Official _Meeting_Minutes_10.03.2022.pdf.

[14] *Supra* note 5.

either erroneous or simply capture voters that would otherwise be cleared from the state's voter rolls through the federally mandated list maintenance process (i.e. the NVRA's required removal process) or Georgia's own removal procedures. *See* O.C.G.A. §§ 21-2-232, 21-2-233, 21-2-235.

71.    When first introduced in February 2023, S.B. 189 primarily addressed vote tabulation and did not include the provision challenged in this Complaint.[15] Section 5 of S.B. 189 (the "Challenged Provision") was added to the bill when it was introduced in the Georgia House on March 28, 2024.  From there, the process to pass S.B. 189 was rushed and irregular. Throughout the debate on S.B. 189, its proponents relied on disproven claims of widespread fraud and election irregularities in Georgia to justify passage of the Act. S.B. 189 was signed on May 6, 2024, the day before the Governor's veto deadline. Section 5 of S.B. 189 went into effect on July 1, 2024.

72.    Section 5 of S.B. 189 mandates a finding of probable cause for an O.C.G.A. § 21-2-230 challenge "[i]f a challenged elector's name appears on the National Change of Address data base, as maintained by the United States Postal Service, as having changed such elector's residence to a different jurisdiction" and

---

[15]    S.B. 189, 2022-2023 Gen. Assemb., Reg. Sess. (Ga. 2023), https://www.legis.ga.gov/api/legislation/document/20232024/214851.

"additional evidence would indicate that the elector has lost his or her residency as determined pursuant to Code Section 21-2-217." This is despite NCOA data being notoriously unreliable and it being well-established that eligible Georgia voters appear in the NCOA database.

73.    A finding of probable cause leads to the voter challenge being sustained by the county board of registrars and a hearing on the grounds of the challenge. *See supra*, Part II.B. As discussed *supra*, Part II.B, notice of the sustained challenge is only provided to the challenged voter "if practical." O.C.G.A. § 21-2-230(b). This means a challenged voter may never know they have been challenged unless they try to vote in-person on Election Day or check the status of their absentee ballot. If the county board of registrars finds the voter is not qualified to remain on the list of electors, the voter cannot vote and is removed from the voter rolls. *Id*.

74.    When counties do provide notice of the challenge brought against the elector based on a change in residence, counties have varied where they send notice to. Some counties have mailed notice of the challenge brought against the elector to the address the elector registered at while others have sent notice to both the new mailing or physical address the challenger provided as well as the registration address.

75.     Neither S.B. 202 nor S.B. 189 specify the quality of evidence that may be used to bring a challenge or impose penalties for bringing unreliable, frivolous, or erroneous challenges. Challengers may bring forward *any* "additional evidence," whether it be screenshots of social media posts or real estate websites. This means that this year, many challenges brought under O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 continue to be "poorly created and carr[y] the enormous possibility of challenging voters' eligibility who [are] in fact eligible voters in Georgia." *Fair Fight Inc,* 710 F. Supp. 3d at 1275.

76.     By mandating that County Boards of Registrars find probable cause to sustain an O.C.G.A. § 21-2-230 challenge based on undefined "additional evidence" of a change in residence, Section 5 of S.B. 189 imposes severe burdens on eligible Georgia voters to prove their eligibility, or risk disenfranchisement or removal from the voter rolls entirely.

77.     If a voter is provided notice of the challenge against them and they appear at the county board meeting deciding whether the challenge should be sustained, currently, there is no guidance on how a voter can rebut the challenge against them. This has caused issues in previous election cycles as county Boards of Registrars have a history of failing to advise voters about how to respond to third-party voter challenges against them. *See Majority Forward*, 512 F. Supp. 3d at 1371.

78.    Overseas and military voters in particular have difficulty resolving the challenges against them because they are living abroad, are posted at military installations around the world, or are otherwise unable to receive notice, or respond to voter challenges in a timely way.

79.    Section 5 of S.B. 189 also promotes erroneous challenges by mandating that probable cause be found to sustain a voter challenge under O.C.G.A. § 21-2-230 because a voter is registered at a nonresidential address, even though residing at a "residential" address is not a qualification to be an elector under federal or Georgia law. *See* O.C.G.A. § 21-2-217. It is unclear how "nonresidential" is defined for the purposes of a challenge, including, for example, whether "nonresidential address" simply refers to addresses in areas zoned as nonresidential.

80.    Because Section 5 of S.B. 189 makes it more likely O.C.G.A. § 21-2-230 challenges will be sustained, causing military and overseas to defend their right to vote, Section 5 of S.B. 189 is likely to impose extreme burdens on overseas and military voters and their families, who have a history of being subject to unfounded challenges and already face issues in casting their ballots, in making sure their vote is counted.

81.    Additionally, because an O.C.G.A. § 21-2-230 challenge can result in a voter's removal from the voter rolls, S.B. 189's allowance of NCOA and other

residency data to be the basis of an O.C.G.A § 21-2-230 challenge is preempted by Section 8(d) of the NVRA, which provides the exclusive method to lawfully remove voters based on a change in residence.

82.    Section 8(d) of the NVRA provides that a voter may only be removed from the voter rolls based on a change in residence if the voter requests or confirms his or her change of address in writing; or if after being sent a prepaid postage and pre-addressed mailing by their county election administrator, the voter fails to respond to that mailing and then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d).

83.    Removing a voter from the rolls based on a voter residency challenge, whether sustained under O.C.G.A § 21-2-230 or O.C.G.A § 21-2-229, violates the NVRA's mandates to give the voter an opportunity to respond to the county's notice of change of residence, 52 U.S.C. § 20507(d)(2), and then give the voter an opportunity to vote in the next two federal general election cycles after receiving the aforementioned notice before removing the voter from the voter rolls, 52 U.S.C. § 20507(d)(1)(B)(ii).

### E.  Challenges since S.B. 189

84.    This year, mass challenges continue to be brought by groups that claim Georgia's elections are fraudulent. One such group is the Georgia Election Nerds,

who have produced videos maintaining the 2020 Election was stolen and claiming to explain how elections are manipulated.

85.    In June, Helen Strahl, on behalf of the Georgia Election Nerds, challenged 826 voters in Chatham County, after which she sent the names of another 20,000 voters to Chatham County for "list maintenance" and challenged an additional 689 students and former students registered at Savannah State University, which is a majority Black institution.[16]

86.    Challenges continue to be based on NCOA and residency data this cycle, despite courts, the Secretary of State's office, and other authorities recognizing the unreliability of NCOA data for accurate list maintenance.[17] For example, in 2023, former General Counsel of the Georgia Secretary of State's Office "Ryan Germany testif[ied] that he 'didn't believe' that NCOA 'was sufficient probable cause' for further inquiry" for a 230 challenge. *Fair Fight Inc*., No. 2:20-CV-00302-SCJ, 2024 WL 24524, at *15.  Yet, some counties have continued to

---

[16] *Supra* note 9.

[17] UNDERSTANDING THE FLAWED DATA METHODOLOGIES UNDERLYING MASS VOTER CHALLENGES, ALL VOTING IS LOCAL, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, DEMOS 5-8 (Sept. 2024), https://allvotingislocal.org/wp-content/uploads/All-Voting-Report-VPT-White-Paper-SEPT-2024-R3.pdf.

uphold challenges based on NCOA and residency data, even without "additional evidence" as is required by Section 5 of S.B. 189.

87.    In Walton County, Margaret Hubbard challenged 100 voters based solely on information she gleaned from "a free system that checks USPS moved out of state records and voter registration in about 30 states." Despite Hubbard's failure to provide any individualized evidence regarding each challenged voter, the Walton County Board of Registrars found probable cause to sustain her mass challenges. *Id*.

88.    In Forsyth County, Stefan Bartelski challenged around 500 voters claiming the voters had moved or were registered to vote elsewhere, partly relying on NCOA data. For some of these voters, Bartelski provided screenshots he gathered that purported to show the voters had registered elsewhere, but for many voters, Bartelski provided no proof of his allegations and simply created a table in a Word document with the voter's new "out of state data." The Forsyth County Board of Voter Registrations and Elections found a lack of evidence for all but five of the voters on Bartelski's challenge lists and dismissed his challenges.

89.    Upon information and belief, hundreds of military and overseas voters have been challenged in 2024. Some of these voters have been challenged in previous election cycles and now must address a duplicative challenge. Some have even been removed from the voter rolls this year due to such challenges.

90.   Upon information and belief, many of these challenged military and overseas voters are registered in Cobb County and have been challenged as recently as August 2024. The challenger bringing the August 2024 challenges relied on NCOA data and data from a discredited privately funded database (Eagle AI)[18].

91.   Challengers have admittedly relied on "unconfirmed online evidence" that a voter lives elsewhere, including supposed screenshots of social media posts of the elector or suspected relatives or friends of the elector, to allege that an elector is not a Georgia resident.

92.   And county boards have been unsure about what "additional evidence" is sufficient to find probable cause. Richmond County asked their local counsel whether screenshots were sufficient evidence to find probable cause a voter is not qualified to be on the list of electors and were advised simply that it was up to the Board to determine what "they feel [is] sufficient" evidence. Other counties and county attorneys may reach different conclusions regarding what is sufficient to find evidence of probable cause, resulting in counties sustaining O.C.G.A. § 21-2-230

---

[18] *See supra* note 17; Grant Blankenship, *A data tool being used to challenge voter registrations is raising many concerns*, NPR (June 20, 2024), https://www.npr.org/2024/06/04/nx-s1-4991945/voter-registration-mass-challenges-georgia.

challenges based upon varying determinations as to the sufficiency of evidence demonstrating probable cause.

93.     Counties have also handled challenges based on the new probable cause grounds mandated by Section 5 of S.B. 189 differently. In particular, counties are not treating challenges alleging that a voter is no longer a Georgia resident or resides at a nonresidential address in the same manner. Macon-Bibb County upheld challenges based on an alleged registration at a P.O. box address. Chattooga County, however, dismissed some voter challenges based on alleged registrations at a nonresidential address while upholding others.

94.     Even though Section 5 of S.B. 189 only modifies O.C.G.A. § 21-2-230 challenges, some counties have treated S.B. 189 challenges alleging that someone has moved as an O.C.G.A. § 21-2-230 challenge (a challenge to participate in an election which, if sustained, does not always result in the removal from the voter rolls), while others have treated such challenges as an O.C.G.A. § 21-2-229 challenge (challenge to a person's voter registration which, if sustained, always results in removal from the voter rolls).

95.     And more fundamentally, some counties have outright dismissed challenges based on residency data while others have sustained the challenges.

96.     Additionally, upon information and belief, some counties have refused to hear any O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 mass challenges within 90 days of the election, pursuant to the NVRA's prohibition against systematic removal of voters from the voter rolls within 90 days of an election, 52 U.S.C. § 20507(c)(2)(A), while others have considered such challenges, even if they dismissed the challenges on other bases.

97.     Finally, while the standards for determining probable cause are ostensibly the same for challenges under O.C.G.A. § 21-2-230 and O.C.G.A. § 21-2-229, when some voters are challenged under both O.C.G.A. § 21-2-230 and O.C.G.A. § 21-2-229 using the exact same evidence, counties have found the challenger has not met the burden of proof for O.C.G.A. § 21-2-229 challenges but has met the burden of proof for O.C.G.A. § 21-2-230 challenges.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of Section 8(d) of the National Voter Registration Act of 1993**
(Plaintiff as to all Defendants)

98.     Plaintiff re-alleges and incorporates each and every relevant allegation contained in the paragraphs above, including paragraphs 1-3, 5-8, 33-66, 69-73, 75-78, 80-97 as if fully set forth.

99.    The NVRA provides federal statutory rights enforceable under 52 U.S.C. § 20510.

100.    Section 8(d) of the National Voter Registration Act of 1993, 52 U.S.C. § 20507(d), provides that "A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant--

(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

(B)(i) has failed to respond to a notice described in paragraph (2); and

(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice." 52 U.S.C. § 20507(d).

101.    Section 8(d) sets forth the exclusive method by which states can remove a registered voter from their statewide voter registration list due to a change in residence. *E.g.*, *Fair Fight Inc. v. True the Vote*, No. 2:20-CV-00302-SCJ, 2024 WL 24524, at *2 (N.D. Ga. Jan. 2, 2024).

102.   Section 5 of S.B. 189 mandates that counties find probable cause to sustain an O.C.G.A. § 21-2-230 challenge based upon unverified evidence that a third party brings forth alleging an elector has moved out of the jurisdiction.

103.   If the challenged elector is unable to defend their right to vote, either due to lack of notice or logistical challenges because they are temporarily outside of Georgia, the challenged elector will likely have to submit a provisional ballot (and then later verify their eligibility) and/or be removed from Georgia's list of electors. This violates, and is therefore preempted by, the NVRA because it mandates removal beyond the exclusive method of removal for change of residence set forth by Section 8(d) of the NVRA.

104.   If an NVRA violation occurs within 30 days before the date of an election for Federal office, notice of the violation is not required. 52 U.S.C. § 20510(b)(3).

105.   But regardless, on July 10, 2024, Plaintiff sent Fulton County Board of Registration and Elections, Gwinnett County Board of Voter Registrations and Elections, Dekalb County Board of Registration and Elections, Cobb County Board of Elections and Voter Registration, Lee County Board of Elections and Registration, Worth County Board of Elections and Registration, Dougherty County Board of Registration and Elections, Forsyth County Board of Voter Registrations

and Elections, Whitfield County Board of Elections, Spalding County Board of Elections and Voter Registration, Richmond County Board of Elections, Chatham County Board of Elections, Macon-Bibb County Board of Elections, Hall County Board of Elections, Lowndes County Board of Elections, Columbia County Board of Elections, Cherokee County Board of Elections and Voter Registration and the Secretary a letter notifying them of these violations. 52 U.S.C. § 20510(b)(1).

106.   This NVRA violation is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230 and determine whether a challenge is being brought on the basis that a voter is not a qualified elector meriting removal from the voter rolls.

107.   It is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger is able to redress this NVRA violation through his authority to interpret Georgia election law and provide guidance and trainings to the County Defendants with respect to challenges.

108.   This NVRA violation is also traceable to Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the County Defendants are bound. O.C.G.A. § 21-2-31.

## COUNT II

### Violation of Section 8(b) of the National Voter Registration Act of 1993
(Plaintiff as to all Defendants)

109.   Plaintiff re-alleges and incorporates each and every relevant allegation contained in the paragraphs above, including paragraphs 1-4, 6-7, 9, 11-60, 62-71, 73, 75, 77-80, 84-85, 89-90, 92-97, as if fully set forth.

110.   Section 8(b) of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (holding that an Ohio law violated Section 8(b) of the NVRA by erecting burdens on a select class of persons (compensated voter registration workers)).

111.   Section 5 of S.B. 189 is not uniform and is discriminatory because it treats voters differently based on the classification of their address and allows for too much discretion by county election officials, leading to divergent practices. *See Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *41

41

(D. Ariz. Feb. 29, 2024) (programs maintaining accurate voter rolls are NVRA-compliant only when the same protocols are applied to everyone, not a subset of voters); *Indiana State Conf. of Nat'l Ass'n for Advancement of Colored People v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) (finding an Indiana law violated the requirements of the NVRA because "county officials [we]re left to use wide discretion in how they determine a duplicate registered voter, and they have used that discretion in very divergent ways").

112. S.B. 189 discriminates against eligible voters who may reside at an address that is deemed "nonresidential" by forcing these voters to prove, under an undefined process, that they are in fact Georgia residents. Whereas, voters registered at a "residential" address are not subjected to challenges based upon the classification of their address. This results in burdensome demands on some eligible Georgia voters discriminating against these voters based on the classification of their address. *United States v. Fla.*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("A state cannot properly impose burdensome demands in a discriminatory manner.")

113. Section 5 of S.B. 189 also creates discriminatory and nonuniform list maintenance procedures by creating an obligation on county officials to sustain voter challenges that a voter lives at a nonresidential address or has moved based on

inaccurate and outdated data and information sources purporting to contain residence information.

114.   If an NVRA violation occurs within 30 days before the date of an election for Federal office, notice of the violation is not required. 52 U.S.C. § 20510(b)(3).

115.   But regardless, on July 10, 2024, Plaintiff sent Fulton County Board of Registration and Elections, Gwinnett County Board of Voter Registrations and Elections, Dekalb County Board of Registration and Elections, Cobb County Board of Elections and Voter Registration, Lee County Board of Elections and Registration, Worth County Board of Elections and Registration, Dougherty County Board of Registration and Elections, Forsyth County Board of Voter Registrations and Elections, Whitfield County Board of Elections, Spalding County Board of Elections and Voter Registration, Richmond County Board of Elections, Chatham County Board of Elections, Macon-Bibb County Board of Elections, Hall County Board of Elections, Lowndes County Board of Elections, Columbia County Board of Elections, Cherokee County Board of Elections and Voter Registration and the Secretary a letter notifying them of these violations. 52 U.S.C. § 20510(b)(1).

116.   This discriminatory and nonuniform treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230.

117.   It is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger is able to redress this disparate treatment through his authority to interpret Georgia election law and provide guidance and trainings to the County Defendants with respect to challenges.

118.   This disparate treatment is also traceable to Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the County Defendants are bound. O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## COUNT III

### Violation of Title I of the Civil Rights Act
(Plaintiff as to all Defendants)

119.   Plaintiff re-alleges and incorporates each and every relevant allegation contained in the paragraphs above, including paragraphs 1-4, 6-7, 9, 11-60, 62-71, 73, 75, 77-80, 84-85, 89-90, 92-97, as if fully set forth herein.

120.   The Civil Rights Act of 1964 provides, in relevant part:

"(2) No person acting under color of law shall –

(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote. . ." 52 U.S.C. § 10101(a)(2)(A)

121.   42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law, including those rights secured by the Civil Rights Act. *Vote.org v. Georgia State Election Bd.*, 661 F. Supp. 3d 1329, 1339 (N.D. Ga. 2023).

122.   The Civil Rights Act defines "vote" broadly to include, "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 52 U.S.C.A. § 10101(a)(3)(A), (e).

123.   By mandating that probable cause be found to sustain a voter challenge under O.C.G.A. § 21-2-230 merely because an eligible voter is registered at a

"nonresidential" address, Section 5 of S.B. 189 applies different, and heightened, standards, practices, and procedures to those voters, compared to other voters in the same county who are registered at "residential" addresses. *See Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (jurisdiction could not require students to fill out supplemental questionnaire).

124.   Section 5 of S.B. 189 requires this differential treatment even though residing at a "residential" address is not a qualification to be an elector under federal or Georgia law. *See* O.C.G.A. § 21-2-217.

125.   Under Section 5 of S.B. 189, a voter who is registered at a "nonresidential" address and who is subject to a challenge would be forced to prove, through Georgia's undefined procedure, that they are a Georgia resident eligible to vote or be subject to disenfranchisement or removed from the voter rolls entirely. Conversely, county boards may dismiss challenges to voters registered at a residential address without additional proceedings. This violates, and is therefore preempted by, the Civil Rights Act because it subjects certain individuals, those voters registered at "nonresidential" addresses, to different standards, practices, and procedures than those applied to other individuals in the same county.

126.   This disparate treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230.

127.   It is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger is able to redress this disparate treatment through his authority to interpret Georgia election law and provide guidance and trainings to the County Defendants with respect to challenges.

128.   This disparate treatment is also traceable to Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the County Defendants are bound. O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## **COUNT IV**

**Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983**
(Plaintiff as to all Defendants)

129.   Plaintiff re-alleges and incorporates each and every relevant allegation contained in the paragraphs above, including paragraphs 1-7, 9-74, 76-78, and 84-97, as if fully set forth herein.

130.   42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

131.   The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000).

132.   To secure the fundamental right to vote, similarly situated Georgia voters may not be subject to "arbitrary and disparate treatment." *Id.*; *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1186 (11th Cir. 2008) ("When a state accords arbitrary and disparate treatment to voters in different counties, which results in their votes being weighed differently, those voters are deprived of their constitutional rights to due process and equal protection.").

133.   Voters that are alleged to have changed their residence are treated differently depending on which county they are registered to vote in. When challenged on the basis that they have moved, some voters are treated as being

48

challenged under O.C.G.A. § 21-2-230 while others are treated as being challenged under O.C.G.A. § 21-2-229. Still other voters are not subject to sustained voter challenges under either statute on the basis the voter has changed their residence. This discrepancy exists even where the evidentiary support for the challenges across the counties is comparable.

134.   Whether counties decide to treat voters challenged on the basis they have moved under O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 or whether counties find probable cause to sustain a challenge based on the same caliber of evidence, has resulted in arbitrary and disparate treatment of eligible Georgia voters.

135.   Voters subject to sustained voter challenge based on residency face different, arbitrary, and unnecessarily burdensome set of barriers to vote compared to voters subject to challenges based on residency that are later dismissed.

136.   This disparate treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230.

137.   It is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger is able to redress this disparate

treatment through his authority to interpret Georgia election law and provide guidance and trainings to the County Defendants with respect to challenges.

138.    This disparate treatment is also traceable to Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the County Defendants are bound. O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## COUNT V

**Deprivation of and Undue Burden on the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983**
(Plaintiff as to all Defendants)

139.    Plaintiff re-alleges and incorporates each and every relevant allegation contained in the paragraphs above, including paragraphs 1-7, 9-73, 75-80, 84-92, and 97, as if fully set forth herein.

140.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

141.    The First and Fourteenth Amendments of the United States Constitution protect the fundamental right to vote of eligible Georgia voters. When analyzing the constitutionality of a voting procedure, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and

Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

142.   When an individual's right to vote is subject to "severe" burdens, the state election law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434.

143.   Section 5 of S.B. 189 subjects eligible voters to severe burdens on the right to vote because Section 5 of S.B. 189 allows voters, including eligible military and overseas voters, to be disenfranchised or removed from the voter rolls because of voter eligibility challenges based solely upon unverified evidence that the voter is no longer a Georgia resident or resides at a nonresidential address.

144.   First, Section 5 of S.B. 189 mandates that probable cause be found to sustain a challenge to a voter's eligibility based on unverified evidence, potentially including purported screenshots of social media posts, as long as the challenger does not rely solely on NCOA data, that a voter has moved or resides at a nonresidential address. However, upon information and belief, at least Walton County has sustained a mass challenge based solely on NCOA data.

145.   Second, counties only have to provide notice to a voter of a challenge against them "if practical." O.C.G.A. § 21-2-230(b). This means a voter may not know a challenge has been lodged against them until they attempt to vote. If voting in-person, the voter will need to prove they are a resident of Georgia and it is unknown what evidence is acceptable to prove they are in fact a Georgia resident.

146.   Most military and overseas voters have to vote via absentee ballot and thus will be unable to show up in-person to prove their eligibility. They may have to appear in a virtual hearing in the middle of their night due to time zone differences to prove they are a Georgia resident, if they are informed of the hearing at all. If the military or overseas voter is not able to attend the hearing or access documents that they are in fact a Georgia resident because the military or overseas voter is temporarily residing elsewhere, the voter may not be able to rebut the challenge against them and thus will be disenfranchised.

147.   Even if the military or overseas voter is able to rebut the challenge made against them and prove their eligibility to vote, enduring such a process to cast their ballot or remain on the voter rolls subjects these voters, especially while overseas or serving elsewhere, to onerous and severe burdens on their right to vote.

148.   This burden is not narrowly tailored, or even reasonably tied, to advance legitimate state interests because, *inter alia*, it mandates the sustaining of

challenges based on unreliable evidence and imposes unreasonably high barriers on voters to resolve challenges against them.

149. Accordingly, Section 5 of S.B. 189 imposes a severe and unjustified burden on the right to vote for eligible military and overseas Georgia voters in violation of the First and Fourteenth Amendments.

150. This unconstitutional treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230 and require electors to prove their eligibility to be able to cast a ballot and remain on the voter rolls.

151. This unconstitutional treatment is also traceable to Defendant Raffensperger, who is responsible for providing guidance to counties on adjudicating challenges under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230, O.C.G.A. § 21-2-50, and Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the County Defendants are bound, O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## COUNT VI

**Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983**
(Plaintiff as to all Defendants)

152.    Plaintiff re-alleges and incorporates each and every relevant allegation contained in the paragraphs above, including paragraphs 1-7, 9-73, 75-80, 84-92, and 97, as if fully set forth herein.

153.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

154.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that before the government can deprive an individual of a property or liberty interest, the individual must be afforded adequate process to safeguard that interest — including both reasonable notice and an opportunity to be heard in a meaningful way. *See Armstrong v. Manzo*, 380 U.S. 545, 550, 552 (1965).

155.    Notice and the opportunity to be heard is a threshold requirement of due process before the deprivation of a fundamental right. *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950). The Supreme Court has held that notice is adequate where "notice [is] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections.*" Id; Dorman v. Aronofsky,* 36 F.4th 1306, 1315 (11th Cir. 2022) (noting that the *Mullane* test applies to determining the adequacy of notice).

156.   The right to vote is a fundamental right granted to eligible Georgia residents by the federal and state constitutions. *See Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1271 (11th Cir. 2019); Ga. Const. art. II, § 1, ¶ II.

157.   Under O.C.G.A. § 21-2-230, as amended by S.B. 189, counties may deprive an individual of the right to vote by sustaining a challenge to the voter's eligibility based on unsubstantiated data. *See id.* As such, due process requires adequate notice and an opportunity to be heard, at minimum.

158.   S.B. 189 lowers the probable cause standard for adjudicating O.C.G.A. § 21-2-230 challenges by requiring counties to hear challenges based on unsubstantiated and faulty data, and allows challenges based on unsubstantiated or faulty evidence to be sustained. *See* O.C.G.A. § 21-2-230(b).

159.   Before S.B. 189, counties could dismiss challenges based on unsubstantiated or faulty evidence for lacking probable cause. S.B. 189 now mandates that counties find probable cause to sustain O.C.G.A. § 21-2-230 challenges, even though the challenged voter may be an eligible Georgia elector, if a voter is registered at a "nonresidential" address or the voter appears to have

changed their residence because the voter appeared in the NCOA database and there is "additional evidence" that suggests the voter changed their residence. O.C.G.A. § 21-2-230. NCOA data is an insufficient basis to challenge a military or overseas voter because there are several legitimate reasons why an eligible military or overseas Georgia voter might appear on the NCOA database. *See supra* Part II.C & D. Thus, S.B. 189's mandate to require county board of registrars to find to probable cause lowers the probable cause standard because it compels county board of registrars to sustain any such challenges, regardless of the veracity of the evidence presented to the county board of registrars. *See* O.C.G.A. § 21-2-230(b).

160.   The adjudication process for O.C.G.A. § 21-2-230 challenges provides that notice will be given "if practical." O.C.G.A. § 21-2-230(b). For miliary and overseas voters, providing timely notice is critical to ensuring that the voter may rebut the challenge against them. But upon information and belief, many counties do not provide timely notice to military and overseas voters, if they provide notice at all. And, because "practical" is undefined, counties do not have a uniform method for understanding what notice is "practical" for military and overseas voters.

161.   Because counties no longer have the discretion to dismiss unfounded challenges, S.B. 189 increases the imperative for meaningful notice and an opportunity to be heard to be provided to a challenged voter. Insofar that O.C.G.A.

§ 21-2-230 only requires notice "if practical," notice of challenges based on NCOA data must be given, and must be timely, in order to provide military and overseas voters the opportunity to be heard. *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950).

162.   Even if notice is provided, additional procedures are required to safeguard the due process rights of miliary and overseas voters in light of the high risk of error under S.B. 189. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution may require additional due process safeguards in order to prevent the erroneous deprivation of a fundamental right. *See Armstrong*, 380 U.S. at 550, 552. Additional procedures could entail notice of the challenge by telephone or email, a virtual option for hearings, the opportunity to rebut a challenge (both before or after being sustained) in writing, or increasing the time between when notice is provided to a challenged elector and the hearing adjudicating whether to sustain the challenge.

163.   Where "the risk of an erroneous deprivation of such interest through the procedures used" outweighs "the probable value [] of additional or substitute procedural safeguards," due process requires additional procedures to prevent the erroneous deprivation of a fundamental right. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)

164.   As noted above, S.B. 189 greatly increases the risk of erroneous deprivation of this fundamental right because it lowers the probable cause standard for adjudicating O.C.G.A. § 21-2-230 challenges.

165.   There is no government interest in failing to provide notice to challenged voters who are military and overseas, nor is there any fiscal and administrative benefit for the failure to provide notice, s*ee supra* Part II.C, while the probable value of additional procedural safeguards would be high given the unique intricacies of residency for military and overseas voters and the risk of disenfranchisement.

166.   Accordingly, Section 5 of S.B. 189 deprives military and overseas voters of meaningful notice and opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

167.   This unconstitutional treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230 and require electors to prove their eligibility to be able to cast a ballot and remain on the voter rolls.

168.   This unconstitutional treatment is also traceable to Defendant Raffensperger, who is responsible for providing guidance to counties on adjudicating challenges under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230,

O.C.G.A. § 21-2-50, and Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the County Defendants are bound, O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court:

(1)    Enter judgment in favor of Plaintiff and against Defendants on the claims for relief as alleged in this Complaint;

(2)    Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged provision of S.B. 189 violate the Fourteenth Amendment to the United States Constitution;

(3)    Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged provision of S.B. 189 is preempted by the National Voter Registration Act of 1993;

(4)    Grant Plaintiff permanent injunctive relief by:

a. Ordering that Defendants, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from enforcing the challenged provision of Section 5 of

S.B. 189 with respect to any voter eligibility challenges made to any voter;

b. Ordering that Defendants, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from removing voters from the registration list pursuant to either an O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 challenge based on alleged change in residency without (1) receiving written confirmation from the voter regarding a change in address or (2) providing notice as required by 52 U.S.C. § 20507(d) and waiting two federal election cycles;

c. Ordering that Defendants, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from rejecting or causing to be rejected any ballot cast by any voter pursuant to a voter challenge determination under either O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 that the voter has moved or lost their Georgia residency or is registered at a nonresidential address without meeting the probable cause standard established pre-S.B. 189;

d. Ordering that Defendants, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from rejecting, causing to be rejected, cancelling, and/or causing to be cancelled any voter registration or voter registration pursuant to a determination from a O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 challenge that a voter has moved or lost their Georgia residency or is registered at a nonresidential address without meeting the probable cause standard established pre-S.B. 189.

e. Ordering that State Defendants are enjoined from adopting rules, regulations, and procedures for processing and adjudicating challenges under either O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 that are inconsistent with Section 8 of the NVRA, Title I of the Civil Rights Act or the Fourteenth Amendment.

f. In the alternative, order the above relief as applied to military and overseas voters entitled to vote under the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301.

(5)   Retain jurisdiction over Defendants for such period of time as may be appropriate to ensure Defendants' compliance with the relief ordered by this Court;

(6)    Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310(e), and 52 U.S.C. § 20510(c); and

(7)    Order any other relief that this Court deems just and proper.

Date: October 15, 2024                              Respectfully submitted,

/s/ *Katherine L. D'Ambrosio*            /s/ *Alice Huling*
Katherine L. D'Ambrosio                   Alice Huling*
(Ga. Bar No. 780128)                       Danielle Lang*
Jennifer Virostko                               Valencia Richardson*
(Ga. Bar No. 959286)                       Daniel S. Lenz*
Ben Watson                                       Rachel Appel*
(Ga. Bar No. 632663)                       Shilpa Jindia*
COUNCILL, GUNNEMANN & CHALLY        CAMPAIGN LEGAL CENTER
LLC                                                  1101 14th St. NW, Ste. 400
75 14th Street, NE, Suite 2475          Washington, D.C. 20005
Atlanta, GA 30309                            Tel: (202) 736-2200
(404) 407-5250                                 Fax: (202) 736-2222
kdambrosio@cgc-law.com                ahuling@campaignlegalcenter.org
jvirostko@cgc-law.com                     dlang@campaignlegalcenter.org
bwatson@cgc-law.com                      vrichardson@campaignlegalcenter.org
                                                         dlenz@campaignlegalcenter.org
                                                         rappel@campaignlegalcenter.org
                                                         sjindia@campaignlegalcenter.org


                                                         *Pro hac vice forthcoming*

                                                         *Counsel for Plaintiff*